UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
                                                         :
SPECIAL HAGAN,                                           :
                                    Plaintiff,           :
                                                         :          13-cv-1108 (JPO)
                     -v-                                 :
                                                         :          OPINION AND ORDER
CITY OF NEW YORK, DIANE CROTHERS,                        :
EDNA WELLS HANDY, PATRICIA LEGOFF,                       :
KATHERINE OLIVER, and CAROLE                             :
WALLACE POST, in their individual and official           :
capacities and as aiders and abettors,                   :
                                    Defendants.          :
                                                         :
----------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      Plaintiff Special Hagan, an African-American former Equal Employment Opportunity

(EEO) Officer for the City of New York, brings this action *pro se* against the City and several of

its officials pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, 42

U.S.C. §§ 1981 and 1983, the New York State Human Rights Law (SHRL), N.Y. Exec. L.

§§ 290 *et seq.*, and the New York City Human Rights Law (CHRL), N.Y.C. Admin. Code

§§ 8–107 *et seq.*  Hagan claims that Defendants discriminated against her on the basis of her

race, primarily by maintaining an environment of cronyism that results in preferential treatment

for Caucasian patronage appointees.  She further alleges that she was subjected to a hostile work

environment and retaliated against for attempting to investigate and draw attention to the City's

unlawful practices.  Defendants have moved to dismiss all claims pursuant to Federal Rule of

Civil Procedure 12(b)(6).  For the reasons that follow, their motion is granted in part and denied

in part.

# I.      Background

## A.      Factual Background[1]

The following facts are drawn from the amended complaint (Dkt. No. 11 ("Am. Compl.")) and the submitted extrinsic documents that may be considered on a motion to dismiss. They are assumed to be true for purposes of this motion.

### 1.      The Parties

Plaintiff is an attorney admitted to practice in the state of New York since 2004 whose career has focused upon promoting equal opportunity in employment.  Defendants are the City and several officials with whom she worked while at the Department of Information Technology and Telecommunications (DOITT) and the Department of Correction (DOC).  The individual defendants are Carole Wallace Post, former Commissioner of DOITT; Diane Crothers, Deputy Commissioner of Citywide EEO for the Department of Citywide Administrative Services (DCAS); Edna Wells Handy, Commissioner of DCAS; Katherine Oliver, Commissioner of the Mayor's Office of Media and Entertainment (MOME); and Patricia LeGoff, Assistant Commissioner of EEO at DOC.  They are sued in their personal and official capacities.  With the exception of Handy, who is African-American, they are all Caucasian.

### 2.      DOITT

Hagan began working at DOITT as Senior Director of EEO on August 30, 2010.  Her responsibilities in this role included conducting investigations, training and advising staff on the City's EEO policy, monitoring the hiring process, and organizing diversity activities.  She

---

[1] The 416-paragraph amended complaint details an extensive and convoluted account of events. Hagan's opposition "affidavit" provides an additional thirty pages of allegations, most of which are redundant, and is essentially devoid of legal argument despite her status as an attorney. Nevertheless, the Court has taken pains to render her allegations intelligible and orderly and to ensure that her claims receive fair treatment.

reported directly to Post.  She also regularly interacted with and reported to Oliver, Crothers, and Georgia Pestana, head of the Law Department's Labor and Employment Division.

Hagan alleges that she was subjected to discrimination in the terms of her employment in several ways.  First, she was required to submit more to verify her income and employment than Rachel Sterne Haot, a Caucasian female hired at the same time who was comparably educated and experienced, reported to a commissioner, and had been self-employed at a comparable income.  While Hagan was asked for copies of checks from her former client, Haot was required to submit only an online printout of her tax return.  Second, Post and Crothers refused her request to have the title of Assistant Commissioner or Executive Director, even though Crothers had an initiative to hire EEO Officers at the level of Assistant Commissioner or higher and in fact provided Caucasian female officers with superior titles and compensation than their African-American peers.  Third, Hagan was given only a part-time staff person while her Caucasian predecessor, Emily Johnson, always had a full-time assistant.  Her experience with staffing is allegedly representative of minority EEO Officers at DOITT.

Beyond inferior terms of employment, Hagan describes an environment of cronyism and disdain for diversity policies, facilitated largely by and at the direction of Post.  In support of this generalization, she alleges that: (i) she was required to serve as EEO Officer for both DOITT and MOME, even though City policy required each agency to have its own officer; (ii) Post told her it did not really matter if someone filed a racial discrimination complaint because the Equal Employment Opportunity Commission (EEOC) rarely investigated claims filed by minorities; (iii) she was hired because of her race, not to promote diversity, but to stem the tide of discrimination complaints without resolving the underlying issues; and (iv) Post encouraged her and other employees not to follow two of the City's hiring policies that promoted diversity—an "open-window" policy requiring positions to be posted online and limiting interviews to those

3

who applied during that period, and a "Rule of 4" policy requiring managers to interview at least four applicants for every position.

When Hagan attempted to investigate complaints and resisted the City's unfair practices, she experienced resistance and retaliation from Post and others.  Shortly after arriving at DOITT, for instance, she was tasked with hiring a full-time staff person for the EEO Unit.  Post wanted her to choose Raymond Ng, an Asian-American male colleague from the Department of Buildings with no experience in EEO and only a Bachelor's degree.  She also wanted to pay him $75,000 a year—$25,000 more than the salary of the former, African-American staff person who had several years of EEO experience and a Master's degree, and had left when her request for a promotion had been denied.  During a one-on-one meeting, Post told Hagan that she knew she was going to pick Joao Texiera, an African-American male, instead of Ng and said: "So you want to hire your own people?  I understand."  (Am. Compl. ¶ 70.)  This comment offended Hagan because it suggested that she was hiring based upon race rather than merit.  In retaliation for not selecting Ng, Post held up the processing of Texiera's hire for several months.  Also in retaliation and on account of her race, Post would "antagonize" Hagan over her job performance and her knowledge of the law throughout her time at DOITT.  (*Id.* ¶¶ 73, 76.)  Hagan experienced further "hostility and retaliation" from Post when she pushed back on DOITT's non-compliance with the open-window and Rule-of-4 policies.  (*Id.* ¶ 106.)

Hagan was later approached by Crothers with a request for a list of managerial hires with their racial demographic information.  Crothers claimed that she was working with the Department of Investigation (DOI) to investigate confidential complaints of racial discrimination in hiring and promotional practices at DOITT.  While she had asked Hagan's Caucasian predecessor, Johnson, for this information only once, she would "relentlessly harass" Hagan for the same because she is African-American.  (*Id.* ¶ 92.)  Hagan subsequently emailed Post,

Crothers, and Mitchell Ahbaulm, an individual in the Law Department, about the anonymous complaints and asked to review the agency's applicant and interview logs, but she was met with "harassment," "lack of support," and "hostility" from "managers, HR and or from Post." (*Id.* ¶ 101.)

In September 2010, Hagan was approached by four MOME minority employees with anonymous complaints of discrimination in hiring and promotion. They claimed that Oliver engaged in cronyism and gave Caucasian employees preferential treatment in terms of opportunities, titles, and compensation. During the course of her investigation, Hagan discovered that MOME had a history of discrimination litigation and that Oliver had hired only Caucasian employees. In October, she attempted to mediate an agreement but Oliver refused to address the complaints. She eventually reached out to Pestana, who told her that she was obligated to investigate. Hagan was subsequently approached with a sexual harassment complaint from an Asian female MOME employee against a Caucasian male coworker. During this investigation, Oliver exhibited racial animus against the complainant and said she wanted to transfer or fire her even though she had no issues with her performance. Oliver also sought to unduly interfere with Hagan's investigation by insisting on knowing when interviews would happen and on being involved in the outcome.

On October 29, pursuant to Pestana's directive, Hagan sent an official notice of the MOME discrimination complaints to Oliver, and on November 2, she hand-delivered a copy to Post. Post began to "harass" Hagan about the level of detail in her agendas, allegedly because it imputed knowledge of discrimination to Post. (*Id.* ¶ 183.) On November 15, Hagan met with Post again to discuss the discrimination and sexual harassment complaints and was asked to

conduct a teambuilding exercise with Oliver's Film, Theatre and Broadcasting (FTB) Group.[2] On November 30 and December 1, Hagan interviewed six employees about the discrimination complaints and sent emails to eight minority MOME staff members in the FTB Group.  After the teambuilding session the next day, Oliver pulled Hagan aside and expressed anger that she had reached out to the eight staff members.  She then contacted Bill Heinzen, General Counsel (GC) to then-Mayor Bloomberg, who informed Post and Oliver that Hagan was not authorized to investigate Oliver because she was a commissioner and ordered an end to the investigation. Hagan alleges that, although the EEO Policy in fact prohibits such investigations, the real reason the investigation was called off was because Oliver did not like the direction in which it was going.

On December 5, Post met with Hagan and told her that the discrimination complaints would be transferred to the Law Department, cancelled Hagan's upcoming teambuilding session, and said that she and Oliver took issue with Hagan's discussion of patronage appointments, abortion, and affirmative action during the FTB session because they were "inappropriate" topics, discussion of which evidenced a "lack of judgment."  (*Id.* ¶ 209.)  Hagan alleges that this was simply a pretext for Post's retaliatory cancellation of the upcoming session because she had provided "full disclosure" of the FTB session topics beforehand.  (*Id.* ¶ 206.)  From then on, Post (and Oliver) prohibited Hagan from visiting any MOME sites.  Post also insisted that Hagan report to Crothers, Johnson, and the GC's office before completing any tasks; required her to put requests in writing; made her stop working on a citywide training initiative; prevented her from conducting training sessions; overloaded her with administrative tasks; and, finally, removed all of her job functions with the exception of investigating complaints and processing applicant logs.

---

[2] Hagan also alleges that, at an unspecified time, she had a "heated discussion" with Crothers about the same topics.  (*Id.* ¶ 191.)  This vague allegation is not entitled to consideration.

On December 23, Hagan discovered that her email was being monitored and deleted, including an email that included DOI's investigation of discrimination at MOME.  On January 5, 2011, Hagan had a "heated exchange" with Post in which she said that she would continue to train despite Post's efforts to stop her.  (*Id.* ¶ 223.)  Post then began to "harass" her about a teaching position she had held at City University of New York, Lehman College since 2002.  Later that month, Hagan had yet another "heated exchange" with Post in which she asked why two African-American senior managers were being made to report to Caucasians with less experience.  (*Id.* ¶ 223.)  Post became "livid" and yelled "this is bullshit, people just need to get to work!"  (*Id.* ¶¶ 234, 238.)  At an unspecified time in January, Post also told Hagan that she was a conservative when she saw her wearing "African attire" with braided hair for the first time.[3]  (*Id.* ¶ 241.)

At a DCAS Task Force meeting on February 11, Crothers instructed attendees to implement the "Reductions in Force" and "Hiring Flexibility" recommendations from the Task Force's report.  In response, Hagan expressed concern that these recommendations were "a blueprint to disband the civil service system" and would lead to more appointments of less-experienced Caucasian patronage hires, thereby disparately impacting minorities.  (*Id.* ¶ 245.)  In retaliation, Hagan was excluded from subsequent task force meetings.

Sometime later, Hagan was approached by an employee with an anonymous tip that fraud and overbilling were rampant in the Emergency Communications Transportation Program (ECTP) and a suggestion that internal controls be put into place to monitor spending.  When

---

[3] Hagan also alleges that she was "discriminated [against] because of her political affiliation" when Post and Oliver cancelled the MOME teambuilding session, and that at a later staff meeting Post said "we have a Democrat amongst us in the room" and looked at Hagan.  (Am. Compl. ¶¶ 207–09, 240.)  Hagan has not asserted any claims for discrimination based upon political affiliation, and because she is an attorney, the Court declines to infer such a claim from her stray allegations.

Hagan approached Post and Ahbaulm with this information, they pressured her to reveal more and insinuated that she should approach the employee to gather additional details.  They did not, however, report the tip to the appropriate authority, and instead Hagan "continued to experience retaliation and reprisal for her protected activities."  (*Id.* ¶ 255.)  In mid-February, Hagan attempted to organize a diversity panel discussion with Oliver's staff.  When Oliver found out, she had Post cancel Hagan's plans.  On February 16, Hagan was called into DOI, where, in a recorded interview, she gave her impressions on the MOME discrimination investigation and described how she had been subjected to retaliation.

### 3.   DOC

On February 18, Hagan met with Post and Crothers and was told that she would be transferred to DOC, where she would remain on DOITT's payroll for 90 days,[4] after which she would either be absorbed onto DOC's payroll or terminated.  During this meeting, Crothers suggested that Hagan was not the only EEO Officer that she had transferred and said "there were others."  (*Id.* ¶ 264.)  Hagan was replaced by Johnson, her Caucasian predecessor, at a higher rate of pay.  Compared to Hagan, Johnson had accomplished substantially less during twice as much time, had less experience, and was not licensed to practice law as required under City policy for her position.  The decision to reinstate Johnson and transfer Hagan was made by Post and Crothers because of Hagan's race and in retaliation for her complaints and investigations.

Hagan initially did not have a title at DOC, but eventually she was given the title of EEO Counsel.  This title had never existed before and was created solely for the purpose of her transfer.  At DOC, Hagan reported to LeGoff.  During their first meeting, LeGoff blurted out that "she had nothing to do with what they did to you!"  (*Id.* ¶ 276.)  Hagan soon realized that the

---

[4] Hagan's probationary period was twice extended, until June 30, 2011.

transfer was a demotion as she no longer reported to a commissioner or had a Blackberry, was assigned only menial tasks, and was not allowed to organize diversity events on her own.  She was also required to work with a Caucasian female who retaliated against her in a more subtle fashion by repeatedly changing the terms of assignments and rejecting her adequate work product.

In time, Hagan noticed that LeGoff exhibited racial animus toward the primarily African-American staff and interacted only with the sole "Latina" staff person.  (*Id.* ¶ 283.)  LeGoff also confided to Hagan that she disliked her staff, leading Hagan to believe that she was "disdain[ful] [of] African Americans and . . . wanted to rid her unit of them by any means necessary."  (*Id.* ¶ 286.)  Hagan was soon enlisted to help staff with their investigations and learned that LeGoff signed off on complaints instead of DOC's commissioner, in violation of EEO policy, and had a practice of changing the findings of her staff and interfering with their investigations based on considerations of agency politics.  Hagan experienced this first-hand while investigating a national origin discrimination complaint against several members of the IT department.  Shortly after the complaint was filed, LeGoff approached Hagan and told her that "the IT group are our friends," implying that she should not make a finding against them.  (*Id.* ¶ 295.)  When Hagan requested a copy of a respondent's resume to compare it with that of the complainant, LeGoff "demanded why [she] would want her resume" and interfered to prevent its production.  (*Id.* ¶ 297.)  LeGoff also became "incensed" upon discovering that Hagan had obtained recorded verbal admissions from two of the respondents of racial discrimination in the IT department.  (*Id.* ¶ 302.)

In April 2011, Hagan was contacted by Dawn Littlejohn, an African-American female who had been the EEO Officer for the Administration of Children's Services (ACS).  Littlejohn complained that she had been demoted and replaced by a less-qualified Caucasian, and claimed

that Crothers had orchestrated the transfer with the Commissioner of ACS and had arranged similar involuntary transfers for two African-American EEO Officers from the Department of Juvenile Justice.  On May 12, Hagan complained in an email to Handy about the practice of "transferring" EEO Officers and her own experience.  Handy replied that she would "look into it" but never contacted Hagan again.  (*Id.* ¶ 309.)  Afterward, Hagan experienced "increased hostility and retaliation" from LeGoff, including an unsuccessful attempt to stop her from training.  (*Id.* ¶ 311.)  LeGoff also allegedly retaliated against Hagan by writing her up for losing her identification card several weeks after Hagan had found it.

On June 6, Udelle Ward, a DOC staff person, called Hagan to set up a time for her to meet with a DOC Captain in the rear lobby of the agency building.  At the meeting, the Captain claimed that he had been the victim of race and national origin discrimination and retaliation for his brother's anti-corruption activities, and that his brother had been arrested and was being repeatedly sexually assaulted in prison in retaliation for reporting corruption of a political official.  Hagan immediately reported these allegations to DOI and, when she did not receive a written acknowledgment of her complaint, contacted several City Council members and the Commissioner of DOI.  Hagan alleges that this incident was an attempt by LeGoff and Ward to entrap her into soliciting a client on DOC premises, again as retaliation.  She bases this upon Ward's earlier statement that she would do whatever was necessary to get an office job and that LeGoff "would look out for her."  (*Id.* ¶ 327.)  Hagan also alleges that she "was retaliated against for reporting" the DOC Captain's fraud and corruption charges.  (*Id.* ¶ 339.)

The last two weeks of Hagan's time at DOC were "filled with hostility," so much so that she spent most of her time at home ill.  (*Id.* ¶ 340.)  On June 29, as she was nearing the end of her investigation of the IT complaint and about to make a finding in favor of the complainant on some counts, she was told that she would be terminated that day instead of on June 30.  Hagan

alleges that "no other DOITT employee has been terminated in such a humiliating and demeaning manner," which was done with Post's "knowledge and approval," and that her termination amounted to further retaliation.  (*Id.* ¶¶ 344–45.)

### 4.   After DOC

On August 15, 2011, Hagan made a follow-up inquiry to Handy regarding her complaint about the improper transfer of EEO Officers.  A week later, she received an email from Handy's Acting GC stating that "we do not believe that it would be productive or appropriate for us to meet to discuss this matter," and informing her that she could file a lawsuit.  (*Id.* ¶ 349.)  Hagan later discovered that Lehman College would not renew her employment contract, and that Post had met with DOITT's former Chief of Staff, who held an executive position at the college, several times in early 2011.  She alleges that Post coordinated the non-renewal of her position as further retaliation for her actions.

### B.   Procedural Background

Hagan filed a charge with the EEOC on April 17, 2012 and received a right-to-sue letter on November 20.  She commenced this action *pro se* on February 19, 2013 and filed an amended complaint on August 21, 2013.  (Dkt. Nos. 2 & 11.)  Defendants moved to dismiss on February 3, 2014.  (Dkt. No. 21.)

## II.   Legal Standard

To withstand a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations "to state a claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim has facial plausibility if the well-pleaded factual allegations of the complaint, presumed true, permit the court to "draw the reasonable inference

that the defendant is liable for the misconduct alleged."[5] *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (citing *Twombly*, 550 U.S. at 556).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678 (citing *Twombly*, 550 U.S. at 555).  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Although *pro se* complaints are generally held to a less stringent standard than pleadings drafted by attorneys, this special solicitude ordinarily does not apply when the *pro se* plaintiff is herself an attorney.  *See Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010) (citations omitted).

In the context of employment discrimination and retaliation claims, "[t]he elements of a prima facie case can help provide an outline of what is necessary to render [the plaintiff's] claims for relief plausible."  *Sommersett v. City of New York*, 09–CV–5916 (LTS), 2011 WL 2565301, *5 (S.D.N.Y. June 28, 2011).  However, "[t]o survive a motion to dismiss, a complaint . . . need not allege specific facts establishing a prima facie case."  *Gonzalez v. Carestream Health, Inc.*, 520 Fed. App'x 8, 9–10 (2d Cir. 2013) (citing *Boykin v. KeyCorp.*, 521 F.3d 202, 213 (2d Cir. 2008) (Sotomayor, J.)); *see also DiPetto v. U.S. Postal Serv.*, 383 Fed. App'x 102, 103 (2d Cir. 2010) (citing *Boykin*); *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 241 (2d Cir. 2007) (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)).  Rather, the complaint need only be "facially plausible and allege sufficient facts to give the defendant fair notice of the basis for the claim."  *Brown v. Daikin Am., Inc.*, 2014 WL 2895974, *5 n.10 (2d Cir. June 27, 2014)

---

[5] In addition to the complaint, the court may consider documents that are attached, incorporated by reference, or integral to the complaint.  *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004).  A document is incorporated by reference if the complaint makes "a clear, definite and substantial reference to [it]," *Helprin v. Harcourt, Inc.*, 277 F. Supp. 2d 327, 330–31 (S.D.N.Y. 2003) (citation omitted), and a document is integral if the complaint "relies heavily upon its terms and effect," *Int'l Audiotext Networ, Inc. v. Am. Tel. & Telegraph Co.*, 62 F.3d 69, 72 (2d Cir. 1995).

(citation omitted).  The plaintiff's burden at this stage has been described as "very lenient, even *de minimis*."  *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003).

## III.   Discussion

Hagan asserts claims for disparate treatment, disparate impact, hostile work environment, and retaliation under Title VII, § 1981, § 1983, the SHRL, and the CHRL.[6]  Her Title VII claims are directed at the City alone.  The remainder of her claims are asserted against all Defendants.[7]

### A.      Title VII Claims

Title VII makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ."  42 U.S.C. § 2000e–2(a)(1).  This provision prohibits intentional discrimination (disparate treatment), "facially neutral practices that have a disparate impact on protected groups" (disparate impact), *Wright v. Stern*, 450 F. Supp. 2d 335, 367 (S.D.N.Y. 2006) (citations omitted), and a "workplace [that] is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" (hostile work environment), *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (citations and quotations omitted).  Title VII also prohibits an

---

[6] Although Hagan frequently frames her claims in terms of systemic discrimination against minority employees and African-American EEO Officers in particular, she has not asserted a pattern-or-practice claim.  *See generally Int'l Brother. of Teamsters v. United States*, 431 U.S. 324 (1977).

[7] In some instances, Hagan asserts claims for "discrimination" alone, or in addition to claims for "disparate treatment" and "disparate impact."  (*See, e.g.*, Count I.)  Disparate treatment and disparate impact, however, are just ways to prove unlawful discrimination.  *See, e.g.*, *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 984 (1988) ("model[s]"); *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 145–46 (2d Cir. 2012) ("theories of liability").  Keeping in mind that "[p]leadings must be construed so as to do justice," Fed. R. Civ. P. 8(e), the Court construes Hagan's claims for "discrimination" to constitute claims under both theories when plausible.

employer from retaliating against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a).

An employer is liable under Title VII for violations committed by its employees while acting within the scope of their employment. *See Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 754–56 (1998) (citing Restatement (2d) of Agency § 219(1)). "[T]angible employment actions" effectuated by a supervisor, "such as hiring, firing, failing to promote, [or] reassignment with significantly different responsibilities . . . become[] for Title VII purposes the act of the employer." *Id.* at 760–62. Title VII does not provide for individual liability.[8] *See Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000) (per curiam).

### 1.    Disparate Treatment

Disparate treatment requires proof that the defendant acted with a discriminatory intent or motive. *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 986 (1988). To establish a prima facie case of disparate treatment, a plaintiff must show: (i) membership within a protected group; (ii) satisfactory performance; (iii) an adverse employment action; and (iv) circumstances surrounding the action that give rise to an inference of unlawful discrimination."[9] *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 (2d Cir. 2002) (citations omitted). An adverse employment action is "a 'materially adverse change' in the terms and conditions of

---

[8] Consequently, to the extent that Hagan can be understood to assert Title VII hostile work environment claims against the individual defendants in Count II, they are dismissed.

[9] "Where there is direct evidence that race was the motivating factor, 'the *McDonnell Douglas* search for a motive is unnecessary and therefore inapplicable.'" *Patrolmen's Benev. Ass'n of City of New York, Inc. v. City of New York*, 74 F. Supp. 2d 321, 333 (S.D.N.Y. 1999) (quoting *Johnson v. State of New York*, 49 F.3d 75, 79 (2d Cir. 1995)). But Hagan does not allege the existence of any such direct evidence.

employment," such as "a termination of employment, . . . a less distinguished title, . . . [or] significantly diminished responsibilities." *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000) (citations and quotations omitted).  It also includes, of course, "wage discrimination," *Borrero v. Am. Express Bank Ltd.*, 533 F. Supp. 2d 429, 438 (S.D.N.Y. 2008), and the "imposition of inferior titles," *Al-Haideri v. Trustees of Columbia Univ. in the City of New York*, 07–CV–106 (LTS), 2007 WL 2187102, *2 (S.D.N.Y. July 26, 2007).  "[A]n inference of discriminatory intent may be derived from a variety of circumstances, including, but not limited to: . . . 'the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.'"  *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 502 (2d Cir. 2009) (quoting *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 37 (2d Cir. 1994)).

Hagan alleges that she is a member of a protected group who performed her job satisfactorily and suffered multiple adverse employment actions, including the loss of substantial job responsibilities, an involuntary transfer that amounted to a demotion, and termination.  She also alleges facts sufficient to raise a plausible inference of discrimination, including (i) that she was subjected to inferior terms and conditions of employment compared to similarly situated Caucasian employees; (ii) that other African-American employees were likewise treated worse than Caucasian employees; (iii) that Post made several racially insensitive comments to her and consistently harassed her about her ability to do her job after she sought to hire an African-American staff person; (iv) that Post fostered an environment of cronyism and was contemptuous of diversity policies; and (v) that Post replaced Hagan with a Caucasian who had performed

poorly and paid her a higher salary.[10]  These detailed allegations are sufficient to survive a

motion to dismiss.  *See Boykin*, 521 F.3d at 215 (plaintiff stated claim of discrimination where

she "identified the particular events giving rise to her claim and alleged that she was treated less

favorably than other loan applications because of her race"); *see also Robinson v. Goulet*, 525

Fed. App'x 28, 30–31 (2d Cir. 2013) (plaintiff stated claim where she "alleged that she was an

African-American female, she was yelled and cursed at because [she is] Black and . . . a female,

and that her work hours were reduced and she was prohibited from working overtime, while

other male and white employees did not face similar reductions") (quotations omitted); *Gachette

v. Metro North High Bridge*, 12–CV–3838 (AJN), 2013 WL 144947, *5 (S.D.N.Y. Jan. 14,

2013) ("By alleging that Metro North was his employer, that he is black, that black electricians

were paid less than white ones and that he was denied overtime opportunities that were instead

given to white electricians, Plaintiff has sufficiently alleged . . . disparate treatment claims.");

*Sommersett*, 2011 WL 2565301, *7 (allegations of adverse employment action and "incidents

suggesting discriminatory animus on the part of at least one supervisor" and of "a systemic

---

[10] Defendants argue that Hagan may not rely upon discriminatory and retaliatory acts that
occurred before June 22, 2011—300 days before she filed her charge on April 17, 2012—
because they are time-barred under Title VII's statute of limitations.  *See* 42 U.S.C. § 2000e–
5(e)(1); *Pilgrim v. McGraw Hill Cos., Inc.*, 599 F. Supp. 2d 462, 473 (S.D.N.Y. 2009) (citing
*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002)).  Whether or not the alleged
discriminatory and retaliatory acts are actionable under the continuing violation exception to the
statute of limitations, *see Cornwell v. Robinson*, 23 F.3d 694, 704 (2d Cir. 1994), Hagan has
made a timely allegation of an adverse employment action—her termination on June 29, 2011—
and the Court may consider her other allegations as "background evidence" to determine whether
that adverse action was the result of a discriminatory motive, *Morgan*, 536 U.S. at 102 (citation
omitted).

Claims brought under 42 U.S.C. §§ 1981 and 1983, the SHRL, and the CHRL are subject to a
three-year statute of limitations.  *Patterson*, 375 F.3d at 225; *Pilgrim*, 599 F. Supp. 2d at 474.
Consequently, all of Hagan's alleged discriminatory and retaliatory acts may be actionable under
these provisions.

pattern of concerted ill-treatment of older Probation Department employees intended to encourage their resignation" were sufficient to state a disparate treatment claim); *Morales v. Long Island R.R. Co.*, 09–CV–8714 (HB), 2010 WL 1948606, *3 (S.D.N.Y. May 14, 2010) ("A complaint that contains specific factual allegations as to events leading up to an adverse action, accompanied by conclusory allegations of discriminatory intent, suffices to state a discrimination claim.") (citing *Boykin*, 521 F.3d at 214–15).

Defendants submit four counterarguments.  First, they contend that Hagan cannot rely upon allegations of discrimination against other minority employees as evidence that she personally was subjected to discrimination, citing *Chin v. Port Authority of New York & New Jersey*, 685 F.3d 135 (2d Cir. 2012).  In *Chin*, the Second Circuit held that individual plaintiffs may not rely upon the class action pattern-or-practice method proof, which "requires the plaintiff to prove only the existence of a discriminatory policy rather than all elements of a prima facie case of discrimination," because "this would conflict with the Supreme Court's oft-repeated holding in the context of disparate-treatment, private nonclass litigation that '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'"  *Id.* at 149–50 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S 248, 253 (1981)).  The court was careful to distinguish, however, between pattern-or-practice as a theory of liability and pattern-or-practice evidence, "emphasiz[ing] . . . that evidence that the [defendant] engaged in a pattern or practice of discrimination—in the ordinary sense of those words, rather than in the technical sense describing a theory of liability for discrimination—remains relevant in assessing whether the plaintiffs proved discrimination using the individual disparate treatment and disparate impact methods of proof."  *Id.* at 147; *see also id.* at 150 ("[such evidence] may be highly relevant").  Defendants' broad interpretation of *Chin* was therefore specifically rejected by the court.  Here,

17

Hagan's allegations of systemic discrimination against other minority employees may be considered, and they bolster her claim that she personally was the victim of discrimination.

Second, Defendants argue that Hagan cannot compare herself to other employees—be they Caucasians who were treated better than minorities, or other minorities who were subjected to inferior treatment—because she has not shown that she is "similarly situated in all material respects." *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir. 1997). To be similarly situated, employees must "have been subject to the same standards governing performance evaluation and discipline and must have engaged in conduct similar to Plaintiff's." *Hill v. Rayboy-Brauestein*, 467 F. Supp. 2d 336, 356 (S.D.N.Y. 2006) (citations omitted). "Whether two employees are similarly situated is ordinarily a question of fact for the jury." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) (citations omitted). To survive a motion to dismiss, a plaintiff need only allege facts making it "plausible that a jury could ultimately determine that the comparators are similarly situated." *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 698 (S.D.N.Y. 2011).

Hagan has done this. The amended complaint compares her to: (i) Haot, who was subject to less demanding requirements to verify her employment and income; (ii) Johnson, who received better staffing, was chosen to replace Hagan at a higher salary despite an inferior record, and was not harassed for managerial information by Crothers; (iii) Caucasian female EEO Officers hired during Crothers's tenure, who received higher compensation and better titles; (iv) other "EEO Officers of color," who consistently received less staffing compared to their Caucasian peers (Am. Compl. ¶ 56); (v) other minority employees (such as the MOME complainants), who were likewise discriminated against because of the environment of cronyism; (vi) and Littlejohn and other African-American EEO Officers, who were similarly demoted and terminated for comparable activities. Hagan's comparisons to other EEO Officers

are plainly relevant, as is her comparison to Johnson, her predecessor and successor.  Haot, too, shares important similarities that could plausibly make her similarly situated for purposes of recruitment requirements.  To be sure, Hagan may encounter difficulties comparing herself to, for instance, EEO Officers and other minority employees in other agencies, or Haot, who was the Chief Digital Officer in a different agency.  (Am. Compl. ¶ 109.)  But her comparative allegations plausibly give rise to "a minimal inference that the difference of treatment may be attributable to discrimination."  *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001).

Defendants also suggest that a discriminatory intent cannot plausibly be inferred on the part of Post, because "[w]hen the same actor hires a person already within the protected class, and then later fires that same person, 'it is difficult to impute to her an invidious motivation that would be inconsistent with the decision to hire.'"  *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) (quoting *Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 560 (2d Cir. 1997)).  This "same actor inference" is, however, just an inference, based upon the notion that someone who hires a person within a protected class is unlikely to develop a bias against the class within a relatively short period of time.  It may be rebutted, for instance, where a substantial period of time has passed, or where there is reason to suspect that the initial decision to hire was consistent with a discriminatory motive.  Here, Hagan alleges that Post hired her because of her race, essentially to quiet minority employees complaining of discrimination without redressing the underlying issues; sought to circumvent and undermine diversity policies; and made several potentially discriminatory remarks.  These allegations make it plausible, for purposes of a motion to dismiss, that Post harbored a veiled discriminatory motive when she hired Hagan.  Even assuming she did not, her views may have changed when she realized that Hagan was not just an African-American, but an African-American who refused to tolerate a discriminatory environment.  *See Feingold v. New York*, 366 F.3d 138, 155 (2d Cir. 2004) (same actor inference

could be refuted where "after complaining about discrimination Feingold became not merely a white Jew but a white Jew who . . . would not tolerate a discriminatory office culture"). Accordingly, the same actor inference does not warrant dismissal of Hagan's claim.

Finally, Defendants point to two of Hagan's exhibits that purportedly contradict her allegations. The first is an email indicating that the delay in processing the hire of Texiera was due to a mayoral hiring freeze and lack of approval from the City's Office of Management and Budget, rather than discrimination and retaliation. (Dkt. No. 45, Ex. 9.) But this self-serving explanation from the City is of limited weight, particularly since Hagan alleges a retaliatory motive on the part of Post (for not selecting Ng) and a general practice of understaffing African-American EEO Officers compared to their Caucasian peers. The second exhibit is a list indicating that most EEO Officers did not hold the title of Assistant Commissioner. (Dkt. No. 45, Ex. 11.) While this document likely undercuts Hagan's allegation that Caucasian EEO Officers hired during Crothers's time received superior titles and compensation compared to African-Americans, its import is unclear since it does not indicate the race or date of hire for each individual. In any event, Hagan's other allegations of discrimination and retaliation are sufficient to carry her claim.

### 2.     Disparate Impact

"Disparate impact is based upon the premise 'that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination.'" *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1041 (2d Cir. 1993) (quoting *Watson*, 487 U.S. at 987). To establish a prima facie case of disparate impact, a plaintiff must: "(1) identify a [facially neutral] policy or practice; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two." *Robinson v. Metro-North*

20

*Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011).

The amended complaint is rife with allegations of cronyism and disregard for the EEO Officer position and diversity policies.  Hagan further alleges that this environment had a disparate impact upon minority employees, including herself, in the terms and conditions of employment.  She has therefore identified a neutral policy—cronyism—that leads to inferior terms and conditions of employment for minority employees and is perpetrated by and at the direction of her supervisor, Post.  "It is well established that cronyism can form the basis of a disparate impact claim where the plaintiff is able to show a pattern of favoritism that closes a protected class out of jobs or contracts."  *Harris v. Hays*, 452 F.3d 714, 721 (8th Cir. 2006) (citing *Foster v. Dalton*, 71 F.3d 52, 57 (1st Cir. 1995)); *see also Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 655 n.9 (1989) (noting that "nepotism, if it were proved to exist, could . . . be subject to challenge if it had a disparate impact on minorities"), *superseded by statute on other grounds*, 105 Stat. 1071 (1991).  Accordingly, Hagan has plausibly alleged a claim for disparate impact.

### 3.    Hostile Work Environment

To establish a prima facie case of a hostile work environment, a plaintiff must identify conduct that "(1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [race]."  *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (citation and quotations omitted).  "Severity and pervasiveness are independent standards, only one of which the plaintiff must meet."  *Zambrano-Lamhaouhi v. N.Y.C. Bd. of Educ.*, 866 F. Supp. 2d 147, 161 (E.D.N.Y. 2011) (citing *Pucino v. Verizon Comm'cns*, 618 F.3d 112, 119 (2d Cir. 2010)).  "Conduct alleged

to have created a hostile work environment must be more than episodic; it must be sufficiently continuous in order to be deemed pervasive." *Dowrich-Weeks v. Cooper Square Realty, Inc.*, 535 Fed. App'x 9, 13 (2d Cir. 2013) (citation and quotations omitted).  However, even a single incident can suffice if it is "extraordinarily severe." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000) (Sotomayor, J.).  Whether a work environment is sufficiently severe or pervasive is determined by considering the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.  "Because the analysis of severity and pervasiveness looks to the totality of the circumstances, 'the crucial inquiry focuses on the nature of the workplace environment as a whole,' and 'a plaintiff who herself experiences discriminatory harassment need not be the target of other instances of hostility in order for those incidents to support her claim.'" *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 547 (2d Cir. 2010) (quoting *Cruz*, 202 F.3d at 570) (emphases removed).

Hagan's hostile work environment claim is supported in large part by the same allegations that underlie her claims for disparate treatment and disparate impact.  Specifically, she identifies several discriminatory remarks; describes an environment of cronyism and various instances of discrimination against other minority employees; alleges that she was harassed by Post throughout her tenure because of her race, including about her ability to do her job and her knowledge of the law; and claims that Post orchestrated her demotion and firing in a "humiliating and demeaning" manner on account of her race.  (Am. Compl. ¶ 344.)  Hagan also alleges that, as a result of her experience at DOITT and DOC, she has suffered "tremendous emotional distress, depression, anxiety, weight gain, hair loss, and [a] variety of skin ailments." (*Id.* ¶ 352.)

While these allegations may be light on specifics, a plaintiff need not provide a list of every alleged discriminatory remark and incident of harassment to state a claim for hostile work environment.  *Kassner*, 496 F.3d at 240–41.  Because Hagan identifies a number of specific events and generally alleges constant harassment, she has plausibly stated a claim.  *See, e.g.*, *id.* at 240 (plaintiff adequately pleaded hostile work environment by alleging "continued harassment" and that her supervisor and co-workers had "repeatedly made degrading comments towards [her], including, but not limited to, 'drop dead,' 'retire early,' 'take off all of that make-up,' and 'take off your wig'"); *Torres v. Pisano*, 116 F.3d 625, 631 (2d Cir. 1997) (plaintiff's corroborated deposition testimony that she was "constantly harassed" was sufficient to survive summary judgment, even if she "could recall the exact dates and circumstances of only a few incidents of harassment").  Defendants' reliance upon cases dismissing claims at the summary judgment stage is misplaced: it is not necessary for Hagan to allege, much less establish, the elements of a prima facie case at this point.  And while *Chukqueze v. NYCERS* involved a motion to dismiss, the plaintiff in that case alleged only three incidents of chastisement over the course of a year, which were neither pervasive nor severe.  891 F. Supp. 2d 443 (S.D.N.Y. 2012).  In contrast, Hagan alleges that she was consistently harassed in a manner that, while probably not severe, was nonetheless plausibly pervasive.  She has therefore stated a claim for hostile work environment.

### 4.    Retaliation

A prima facie case of retaliation consists of: "(i) engagement by the plaintiff in a protected activity; (ii) awareness by the employer; (iii) an adverse employment action; and (iv) a causal connection between the protected activity and the adverse action."[11]  *Collins*, 305 F.3d at

---

[11] In the context of retaliation, an adverse employment action is defined more broadly as acts that are "harmful to the point that they could well dissuade a reasonable worker from making or

118 (citation and quotations omitted).  A plaintiff engages in a protected activity if she "oppose[s] any practice made an unlawful employment practice" by Title VII, or 'make[s] a charge, testifie[s], assist[s], or participate[s] in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e–3(a).  Title VII's anti-retaliation provision thus "has two parts: the opposition clause and the participation clause."  *Glover v. S. Carolina Law Enforcement Div.*, 170 F.3d 411, 413 (4th Cir. 1999).  Opposition activity is protected so long as the plaintiff had a "good faith, reasonable belief that the underlying challenged actions of the employer violated the law." *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988) (citation and quotations omitted).

### a.    Protected Activity

As an initial matter, Hagan's participation as Senior Director of EEO in DOITT's internal investigations does not fall under the "participation" clause because it related solely to "in-house investigation[s], conducted apart from a formal charge with the EEOC."  *Townsend v. Benjamin Enters., Inc.*, 679 F.3d 41, 48 (2d Cir. 2012) (quoting *E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000)).  The fact that such proceedings may have ultimately led to the filing of formal EEOC complaints does not make them part of a Title VII investigation.  *See id.* at 50–51 (rejecting contention that "because internal investigations are integral to the deterrent aims and effective operation of Title VII, participation in such investigations should qualify as protected activity").

---

supporting a charge of discrimination."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006); *see also Hicks v. Bains*, 593 F.3d 159, 165 (2d Cir. 2010) ("[A]nti-retaliation protection is broader and 'extends beyond workplace-related or employment-related retaliatory acts and harm.'") (quoting *White*, 548 U.S. at 67).  Since Hagan has shown an adverse employment action under the narrower discrimination standard, she has satisfied this element of her retaliation claim.

Hagan does plausibly allege, however, that she stepped out of her role as an agent of DOITT and opposed the agency's discriminatory practices because of their impact upon minority employees.  *See, e.g.*, *Ezuma v. City Univ. of New York*, 665 F. Supp. 2d 116, 123 (E.D.N.Y. 2009) (distinguishing under the opposition clause between an employee who "was simply doing his job forwarding complaints that came to his attention, or, rather, was challenging the institution to take corrective action because he believed it was necessary to do so"), *aff'd*, 367 Fed. App'x 178 (2d Cir. 2010).  Specifically, she claims that she suffered retaliation for opposing Post's environment of cronyism and non-compliance with diversity policies; raising awareness of such policies during teambuilding sessions; and advocating against the Task Force's recommendations.[12]

Taken as a whole, these allegations suggest that Hagan was retaliated against because she advocated for systemic reform and the rights of minority employees and, in so doing, became a thorn in the side of officials who wanted to persist in unlawful discriminatory practices.  This is quintessential opposition activity that goes beyond mere participation in her role as an EEO Officer.  *See, e.g.*, *Adams v. Northstar Location Servs., LLC*, 2010 WL 3911415, *4 (W.D.N.Y. Oct. 5, 2010) (finding plaintiff human resources manager engaged in protected activity where she "persuaded management that it would be 'inappropriate' to fire certain minority employees" because this "advocacy for certain minority employees was an 'assertion of rights' and thus would constitute protected activity") (quoting *Ezuma*, 665 F. Supp. 2d at 122); *cf. Crawford v. Metropolitan Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009) ("When an employee communicates to her employer a belief that the employer has engaged in . . . a form of

---

[12] Hagan also alleges that she was retaliated against for reporting discriminatory treatment of African-American EEO Officers to Handy in her May 12, 2011 email.  As discussed *infra*, the email did not, under any plausible reading, constitute a complaint of retaliation on this basis.

employment discrimination, that communication 'virtually always' constitutes the employee's *opposition* to the activity.") (citation and quotations omitted).  Hagan likewise engaged in opposition activity when she made complaints on her own behalf, rather than solely on behalf of others.  *See, e.g.*, *McKenzie v. Renberg's, Inc.*, 94 F.3d 1478, 1486–87 (10th Cir. 1996) (recognizing that a personnel director could engage in protected opposition activity by "lodging a personal complaint about the wage and hour practices of her employer and *asserting* a right adverse to the company" rather than merely "assist[ing] the company in complying with its obligations under the FLSA"); *Ezuma*, 665 F. Supp. 2d at 122–23 (recognizing a "distinction between an employee's reporting of egregious conduct directed at her . . . and an employee's reporting of egregious conduct directed at another").

### b.      Knowledge

Defendants contend that Hagan has not alleged knowledge on the part of the City because her May 12 email to Handy does not make a clear complaint of discrimination.  (Dkt. No. 45, Ex. 15.)  Even so, that email pertains solely to the City's alleged practice of involuntarily transferring African-American EEO Officers in retaliation for their protected activities, and Defendants do not contest that Hagan made her opposition to DOITT's other practices (*e.g.*, cronyism) known to Post and others in management.  Nor is there any reason that Hagan must have complained to Handy as opposed to others in a supervisory position.  *Patane*, 508 F.3d at 115 ("general corporate knowledge" is sufficient to satisfy the knowledge requirement) (citing *Kessler v. Westchester Cnty. Dep't of Soc. Servs.*, 461 F.3d 199, 210 (2d Cir. 2006)).  Hagan has therefore plausibly alleged knowledge on the part of the City.

### c.      Causal Connection

"[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial

evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000).  After the Supreme Court's decision in *University of Texas Southwest Medical Center v. Nassar*, a plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer."  133 S. Ct. 2517, 2533 (2013).  While this alters the plaintiff's prima facie burden, it does not appear to alter the pleading requirements since causation is a question of fact and a plaintiff need not establish a prima facie case to withstand a motion to dismiss.  *Cf. Harris v. NYU Langone Med. Ctr.*, 12–CV–0454 (RA) (JLC), 2013 WL 3487032, *19 n.27 (S.D.N.Y. July 9, 2013), *rep. and rec. adopted as modified*, 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013) ("[*Nassar*] does not appear to alter the pleading requirements for plaintiffs in employment discrimination cases . . . .").

The bulk of Hagan's opposition activity occurred between June and November 2010, and she began to experience adverse employment actions in early December until her termination in June 2011.  Although this may be too long of a period to establish causation on its own, *compare Murray v. Visiting Nurse Servs.*, 528 F. Supp. 2d 257, 275 (S.D.N.Y. 2007) (more than two or three months is too long) (collecting cases), *with Anderson v. State of N.Y., Office of Court Admin. of Unified Court Sys.*, 614 F. Supp. 2d 404, 430 (S.D.N.Y. 2009) ("substantial authority holding that a period between five and six months is sufficient") (collecting cases), it does count as circumstantial evidence.  Moreover, where protected activity is followed by minor adverse adjustments in the terms of employment, it becomes more plausible that an ensuing adverse employment action was caused by the protected activity.  *Cf. Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001) (noting that timing cannot establish causation if "gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity").

27

In addition to temporal proximity, Hagan alleges that Post knew about her opposition and orchestrated the adverse employment actions, *see id. Murray*, 528 F. Supp. 2d at 271–72; made several racially disparaging remarks; and sought to promote an environment of cronyism and to undermine diversity policies.  She also alleges that other African-American EEO Officers who engaged in similar opposition activity were involuntarily transferred and terminated at the direction of Post and Crothers.  Taken together, these allegations are sufficient to nudge her retaliation claim from possible to plausible.

### B.       SHRL and CHRL Claims Against the City

The SHRL and CHRL contain anti-discrimination and retaliation provisions analogous to those in Title VII.  N.Y. Exec. L. § 296(1)(a), (e); N.Y.C. Admin. Code § 8–107(1)(a), (7).  "Claims brought under the NYSHRL are analytically identical to those brought under Title VII."[13]  *Dowrich-Weeks*, 535 Fed. App'x at 11 n.2 (citing *Estate of Hamilton v. City of N.Y.*, 627 F.3d 50, 55 (2d Cir. 2010)); *Leopold v. Baccarat, Inc.*, 174 F.3d 261, 264 n.1 (2d Cir. 1999) (citing *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n.4 (2d Cir. 1995), *abrogated on other grounds by Ellerth*, 524 U.S. 742).  And although the analysis under the CHRL differs in certain respects from that under Title VII and the SHRL, in each instance the city law grants employees broader protections than its federal and state counterparts.  *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 105 (2d Cir. 2013).  Accordingly, Hagan has plausibly stated claims against the City under the SHRL and CHRL.

---

[13] It is not yet clear whether the "but-for" standard governing Title VII retaliation claims applies to retaliation claims brought under the SHRL.  *See, e.g.*, *Joseph v. Owens & Minor Distribution, Inc.*, 2014 WL 1199578, *13 n.11 (E.D.N.Y. Mar. 24, 2014).  Since the Court holds that Hagan has stated a claim for retaliation under Title VII, however, she has likewise stated a claim under the SHRL, and it is not necessary to resolve this question, which is best left to the New York state courts in the first instance.

### C.     42 U.S.C. §§ 1981 and 1983 Claims Against the City

Section 1981 guarantees that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." "This section thus outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship, such as employment," *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004) (citation omitted), and confers causes of action for discrimination and retaliation, *see CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446–48 (2008); *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 69 (2d Cir. 2000).  The Equal Protection Clause of the Fourteenth Amendment likewise confers a cause of action for discrimination (but not retaliation), *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1995), while the First Amendment protects public employees from retaliation for engaging in constitutionally protected speech, *Connick v. Myers*, 461 U.S. 138, 143–46 (1983).

Section 1983, in turn, gives rise to a cause of action against any "person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."  This section "merely provides a method for vindicating federal rights elsewhere conferred, such as those conferred by § 1981," or the First and Fourteenth Amendments.[14]  *Patterson*, 375 F.3d at 225 (citation and quotations omitted). With respect to § 1981, "[t]he express 'action of law' provided by § 1983 . . . provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor."  *Jett v. Dallas Ind. Sch. Dist.*, 491 U.S 701, 733 (1989);

---

[14] "A § 1983 action may not, however, be brought to vindicate rights conferred only by a statute that contains its own structure for private enforcement, such as Title VII."  *Patterson*, 375 F.3d at 225 (citing *Saulpaugh v. Monroe Comm. Hosp.*, 4 F.3d 134, 143 (2d Cir. 1993)).

*see also Gladwin v. Pozzi*, 403 Fed. App'x 603, 605 (2d Cir. 2010) ("Gladwin's § 1981 claims are encompassed by her § 1981 claims, and both are therefore analyzed under § 1983.") (citing *Jett*).

To state a claim under § 1983, a plaintiff must allege that (i) a person deprived him of a federal right (ii) while acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). "As a general rule, 'state employment is . . . sufficient to render the defendant a state actor.'" *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 744 (2d Cir. 2003) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)). But this is not enough to impute liability to the City. In contrast to the *respondeat superior* standard governing Title VII, "[a] municipal entity may be liable under 42 U.S.C. § 1983 only if the alleged . . . violation was caused by the entity's 'policy or custom.'" *Mandell v. Cnty. of Suffolk*, 316 F.3d 368, 385 (2d Cir. 2003) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). A policy or custom can be established by "an express rule or regulation," *Patterson*, 375 F.3d at 225 (citing *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870 (2d Cir. 1992)); "discriminatory practices of city officials [that] are persistent and widespread"; "actions of subordinate city employees . . . [that] are so manifest as to imply the constructive acquiescence of senior policy-making officials," *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2d Cir. 1991) (citations and quotations omitted); or "a 'single unlawful discharge, if ordered by a person whose edicts or acts may fairly be said to represent official policy,'" *Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 128 (2d Cir. 2004) (quoting *Rookard v. Health & Hosps. Corp.*, 710 F.3d 41, 45 (2d Cir. 1983)) (internal quotations omitted). To hold a municipality liable on the basis of a single act, however, the plaintiff must show that the official is a "final policymaker with respect to the particular conduct challenged in the lawsuit." *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008) (citation omitted).

### 1. Claims Under § 1981 and the Equal Protection Clause

Generally, the same standards that govern Title VII apply to Hagan's claims for discrimination and retaliation under § 1981 and the Equal Protection Clause. *See Patterson*, 375 F.3d at 225; *Feingold*, 366 F.3d at 159 (citations omitted). However, "a plaintiff pursuing a claimed violation of § 1981 or denial of equal protection under § 1983 must show that the discrimination was intentional." *Id.* at 226 (citations omitted). Accordingly, to the extent that Hagan asserts disparate impact claims under § 1983, they are dismissed. *See Washington v. Davis*, 426 U.S. 229, 239, 246 (1976); *Reynolds v. Barrett*, 685 F.3d 193, 201–02 (2d Cir. 2012). This leaves her disparate treatment and hostile work environment claims under the Equal Protection Clause and her disparate treatment, hostile work environment, and retaliation claims under § 1981.

Hagan's claims in this context are subject to the same analysis as those under Title VII, the SHRL, and CHRL, with the caveat that she must adequately allege that Defendants acted under color of state law and pursuant to a policy, custom, or practice. Hagan's allegations "suggest[] a broad practice" of discriminatory treatment on the basis of race at the hands of "management" officials, notably the Commissioner of DOITT. This is sufficient to allege that a final policymaker was either responsible for, or acquiesced in, a policy or custom of discrimination. *Gachette*, 2013 WL 144947, *6. Hagan's allegations likewise suggest a policy of retaliation against African-American EEO Officers on the part of at least Post and Crothers. Accordingly, she has plausibly alleged claims against the City under § 1983 for violations of § 1981 and the Equal Protection Clause.

### 2. First Amendment Retaliation

It is well settled that public employees do not "relinquish the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v.*

*Bd. of Educ. of Twp. High Sch. Dist. 205, Will. Cnty.*, 391 U.S. 563, 568 (1968).  Still, "these rights are not absolute, because the government, as an employer, has a legitimate interest in regulating the speech of its employees to promote the efficiency of its public services."  *Mandell*, 316 F.3d at 382 (citing *Connick*, 461 U.S. at 140).  The Supreme Court's First Amendment jurisprudence has therefore sought to balance the employee's "right . . . to speak as a citizen addressing matters of public concern" and the "public's interest in receiving the well-informed views of government employees engaging in civic discussion" with the government's interest in exercising "a significant degree of control over [its] employees' words and actions . . . [to ensure] the efficient provision of public services."  *Garcetti v. Ceballos*, 547 U.S. 410, 418–19 (2006) (citations omitted).

To establish a prima facie case of retaliation under the First Amendment, a plaintiff must show that: "1) her speech was constitutionally protected; 2) she suffered an adverse employment action; and 3) a causal relationship between the two existed in that the speech was a substantial or motivating factor for the adverse employment action."  *Burkybile v. Bd. of Educ. of Hastings-on-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 313 (2d Cir. 2005) (citing *Morris v. Landau*, 196 F.3d 102, 110 (2d Cir. 1999)).  In *Garcetti*, the Supreme Court identified two inquires for determining whether a public employee's speech is constitutionally protected.  The threshold question is "whether the employee spoke as a citizen on a matter of public concern."  547 U.S. at 417 (2006).  This inquiry can be further "parsed . . . into separate questions as to (1) whether the subject of the employee's speech was a matter of public concern and (2) whether the employee spoke 'as a citizen' rather than solely as an employee."  *Jackler v. Byrne*, 658 F.3d 225, 235 (2d Cir. 2011).  If the answer to these questions is yes, "then the possibility of a First Amendment claim arises" and the court must determine "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general

public." *Garcetti*, 547 U.S. at 417.  "If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech."  *Id.*

Hagan plausibly identifies five categories of speech that may be protected by the First Amendment: (i) her complaint to Handy of "systemic racial discrimination against Black EEO Officers" (Dkt. No. 42 at 10); (ii) her report of fraud and corruption in the ECTP to Post and Ahbaulm; (iii) her opposition to the Task Force's recommendations; (iv) her conveyance of the DOC Captain's complaint of discrimination, retaliation, and political corruption to DOI and several members of the City Council; and (v) her opposition to DOITT's environment of cronyism and non-compliance with diversity policies.  Each category is analyzed below.

### a.      Matter of Public Concern

"Speech involves matters of public concern 'when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'"  *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014).  "Whether an employee's speech addresses a matter of public concern is a question of law for the court to decide, taking into account the content, form, and context of a given statement as revealed by the whole record."  *Lewis v. Cohen*, 165 F.3d 154, 163 (2d Cir. 1999) (citation omitted).  Of particular relevance is the speaker's motive: where speech "is calculated to redress personal grievances" rather than "broader public purposes," it does not address a matter of public concern.  *Id.* at 163–64.  Moreover, a mere gesture toward a "supposed popular interest in the way public institutions are run" will not "transform a personal grievance into a matter of public concern."  *Ruotolo v. City of New York*, 514 F.3d 184, 190 (2d Cir. 2008) (citation and quotations omitted).

Hagan's speech focuses upon cronyism, systemic discrimination, corruption, and fraud. Each of these subjects is of interest to the public.  The Second Circuit has "repeatedly held that

discrimination in a government workplace is a matter of public concern." *Cotarelo v. Vill. of Sleepy Hollow Police Dep't*, 460 F.3d 247, 252 (2d Cir. 2006) (collecting cases). Likewise, "corruption in a public program and misuse of [government] funds . . . obviously involves a matter of significant public concern." *Lane*, 134 S. Ct. at 2380 (citing *Garcetti*, 547 U.S. at 425). "[T]here is [also] a demonstrated interest in this country that government service should depend upon meritorious performance rather than political service." *Connick*, 461 U.S. at 148.

Defendants offer two counterarguments, both of which focus upon Hagan's May 12 email to Handy. First, even on a generous reading, the email does not complain of a policy of transferring African-American EEO Officers in retaliation for engaging in protected activities. Hagan never describes her race or that of other EEO Officers, and she speaks only of officers who were "'transferred' out of [their] position[s]." (Dkt. No. 45, Ex. 15.) While it is possible that Handy knew Hagan's race based upon a preexisting relationship (*see id.* ("It's been some time since I last reached out to you. . . . I am no longer DoITT's EEO officer.")), it is a stretch to call this inference plausible. Still, Hagan does make clear that she was performing her job admirably and implies that she and a "group" of similarly situated EEO Officers were improperly transferred out of their positions despite their performance. (*Id.* ("the rest of the EEO Officers").) An agency policy of eliminating EEO Officers who are doing their job well is certainly a matter of public concern. To the extent that there are ambiguities as to the content, form, and context of the email, Defendants' objection is better left until the completion of discovery.

Second, Defendants argue that the email reflects a "personal grievance" and therefore cannot address a matter of public concern. The fact that an employee's complaint arises out of her own circumstances, however, does not preclude it from being protected if it addresses a widespread policy and asserts the rights of others similarly affected. *See, e.g.*, *Cotarelo*, 460

F.3d at 252 (speech "concerning discrimination problems generally and . . . not limited to instances affecting only [the plaintiff] was [a] matter of public concern, rather than mere personal grievance").  Moreover, given Hagan's role as an EEO Officer and her longstanding professional interest in promoting equal opportunities in employment, she is better characterized as a person "on a mission to protect the public welfare" than as someone who was primarily seeking "to protect her own reputation."  *Ezekwo v. N.Y.C. Health & Hospitals Corp.*, 940 F.2d 775, 781 (2d Cir. 1991).  In any event, "motive is not dispositive."  *Reuland v. Hynes*, 460 F.3d 409, 416 (2d Cir. 2006); *see also Sousa v. Roque*, 578 F.3d 164, 169–175 (2d Cir. 2009).  At this point, Hagan has plausibly alleged that her email—and her other speech, which Defendants do not challenge—address matters of public concern.

### b.        Speech as a Citizen

Whether Hagan spoke as a citizen presents a more difficult question.  Until recently, the seminal case was *Garcetti*, which held that public employees do not speak as citizens when they "make statements pursuant to their official duties."  547 U.S. at 421.  At issue was whether Ceballos, a deputy district attorney, spoke as a citizen when he provided his supervisor with a memorandum regarding a defective search warrant affidavit.  *Id.* at 413–15.  Writing for a five-member majority of the Court, Justice Kennedy held that he had not.  Two factors were relevant but not dispositive.  First, since the subject matter of the memorandum related to Ceballos' employment, the memorandum was more likely to constitute speech as an employee.  But the Court declined to adopt a categorical rule because public employees "are, as a class, the members of a community most likely to have informed and definite opinions" on matters of public importance related to their employment, and it is therefore "essential that they be able to speak out freely on such questions without fear of retaliatory dismissal."  *Id.* at 421 (quoting *Pickering*, 391 U.S. at 572).  Second, the fact that Ceballos "expressed his views inside his

office, rather than publicly" also suggested that his speech was unprotected, but because citizens frequently discuss public issues in the workplace, "it would not serve the goal of treating public employees like 'any member of the general public' to hold that all speech within the office is automatically exposed to restriction." *Id.* at 420–21 (quoting *Pickering*, 391 U.S. at 573).

"The controlling factor," Justice Kennedy reasoned, was that Ceballos's "expressions were made pursuant to his duties as a calendar deputy." *Id.* at 421. "[A]s a prosecutor," he had a "responsibility to advise his supervisor about how best to proceed with a pending case." *Id.* This point was important because Ceballos's speech, as "work product' which "owe[d] its existence to [his] professional responsibilities," did not touch upon his "participa[tion] in public debate." *Id.* at 421–22. While Ceballos "retain[ed] the prospect of constitutional protection for [his] contributions to the civic discourse," his memorandum was not such a contribution, and the First Amendment did not "invest [him] with a right to perform [his] job however [he saw] fit." *Id.* at 422. This determination was supported by the fact that an ordinary citizen could not file a memorandum advising Ceballos's supervisor about deficiencies in a search warrant affidavit: "[w]hen a public employee speaks pursuant to employment responsibilities . . . there is no relevant analogue to speech by citizens who are not government employees." *Id.* at 424.

Justice Kennedy closed by making several observations. First, it was undisputed that Ceballos wrote his memo "pursuant to his employment duties" and therefore the Court had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* at 424. Second, in response to Justice Souter's concern in dissent, the court recognized that employers may not "restrict employees' rights by creating excessively broad job descriptions" and that "[t]he proper inquiry is a practical one" since "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform." *Id.* at 424–25. Finally, again in response to Justice Souter, the

36

Court noted that "[e]xposing governmental inefficiency and misconduct is a matter of considerable significance," as is reflected by the existence of whistle-blower protection laws, but this did not mean that "the First Amendment shields from discipline the expressions employees make pursuant to their official duties." *Id.* at 425–26.

Last term, the Supreme Court revisited the issue of speech as a citizen in *Lane v. Franks*, in which it considered "whether the First Amendment protects a public employee who provides truthful sworn testimony, compelled by subpoena, outside the scope of his ordinary job responsibilities." 134 S. Ct. at 2378. While conducting a financial audit, Lane, a program director at a community college, discovered that a state representative employed by the college was committing fraud and fired her. This spawned an investigation by the Federal Bureau of Investigation, and Lane eventually testified against the representative at grand jury proceedings and at trial. He was subsequently terminated by the college and brought suit for retaliation. *Id.* at 2375–77.

The district court granted summary judgment for the defendants, reasoning that Lane's testimony was not protected under *Garcetti* because he "had 'learned of the information that he testified about while working as Director . . .' such that his speech [could] still be considered as part of his official job duties and not made as a citizen on a matter of public concern.'" *Id.* at 2376 (quoting *Lane v. Central Ala. Cmty. Coll.*, 2012 WL 5289412, *10 (N.D. Ala. Oct. 18, 2012)). The Eleventh Circuit affirmed, likewise reasoning that since Lane "'was acting pursuant to his official duties when he investigated [the employee], spoke with [her] and [agency] officials regarding the issue, and terminated [her],'" his speech "'owe[d] its existence to [his] professional responsibilities' and [was] 'a product that the employer [itself] ha[d] commissioner or created'" under *Garcetti*. *Id.* at 2376–77 (quoting *Lane v. Central Ala. Cmty. Coll.*, 523 Fed. App'x 709, 711–12 (11th Cir. 2013)).

In a unanimous opinion by Justice Sotomayor,[15] the Court reversed.  "*Garcetti*," the Court observed, "said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment."  *Id.* at 2379.  And for good reason: "[s]peech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"  *Id.* at 2377 (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).  "It would be antithetical to [the Court's] jurisprudence to conclude that the very kind of speech necessary to prosecute corruption by public officials—speech by public employees regarding information learned through their employment—may never form the basis for a First Amendment retaliation claim."  *Id.* at 2380.  By treating dispositive the fact that "Lane learned of the subject matter of his testimony in the course of his employment," the Eleventh Circuit had "read *Garcetti* far too broadly" and ignored the Court's "explicit" qualification "that its holding did not turn on the fact that the memo at issue 'concerned the subject matter of [the prosecutor's] employment.'"  *Id.* at 2379 (quoting *Garcetti*, 547 U.S. at 421).  The proper inquiry was "whether the speech at issue is itself *ordinarily* within the scope of an employee's duties." *Id.* (emphasis added).  Since it was "undisputed that Lane's ordinary job responsibilities did not include testifying in court proceedings," his speech was undisputedly protected.[16]  *Id.* at 2378 & n.4.

---

[15] Justice Thomas, joined by Justices Scalia and Alito, concurred to emphasize that the Court was not deciding "whether a public employee speaks 'as a citizen' when he testifies in the course of his ordinary job responsibilities."  *Id.* at 2384 (Thomas, J., concurring).

[16] The Court went on to explain that "[s]worn testimony in judicial proceedings is a quintessential example of speech as a citizen" because an employee testifying in such proceedings "bears an obligation," as a citizen, "to the court and society at large, to tell the truth."  134 S. Ct. at 2378–79.  While a public employee so testifying "may bear separate obligations to his employer—for example, an obligation not to show up to court dressed in an unprofessional manner," "any such obligations as an employee are distinct and independent from

Three points of significance follow from *Lane*.  First, *Garcetti*'s "pursuant to official duties" standard remains good law.  *See id.* at 2378, 2382; *id.* at 2383 (Thomas, J., concurring). However, it must be understood in light of *Lane*'s "ordinary job responsibilities" standard, which the court repeatedly used in lieu of *Garcetti*'s more cryptic language.  *Id.* at 2375, 2377–78, 2381; *id.* at 2383–84 (Thomas, J., concurring); *cf. Garcetti*, 547 U.S. at 449 ("ordinary job-related duties") (Breyer, J., dissenting).  The use of the qualifier "ordinary"—which does not appear in *Garcetti* or any other case on point—both sharpens the inquiry and arguably "signal[s] a narrowing of the realm of employee speech left unprotected by *Garcetti*."  *See Mpoy v. Rhee*, 2014 WL 3407531, *6–7 (D.C. Cir. July 15, 2014).  The question is not whether an employee's speech is made pursuant to *any* official duty, but whether it is made pursuant to one of his ordinary official duties.

Second, *Lane* emphasizes that employee speech is not precluded from protection simply because it "concerns information *related to* or *learned through* public employment."  *Id.* at 2377 (emphases added); *see also id.* at 2378 ("relates to his public employment or concerns information learned during that employment"), *id.* at 2379 (same).  Whereas the term "ordinary" informs what constitutes "official duties," this language appears calculated to inform what speech is made "pursuant to" such duties.  In both instances, the Court sought to "articulate a [more] comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate."  *Garcetti*, 547 U.S. at 424.  And in both instances, the Court

---

the obligation, as a citizen, to speak the truth."  *Id.* at 2379.  This language arguably suggests that truthful sworn testimony in judicial proceedings is speech as a citizen *even if* it is part of the employee's "ordinary job responsibilities," because the employee has a separate obligation, as a citizen, to provide such testimony.  *See id.* at 2380 (recognizing that a rule permitting employers to retaliate against employees for providing truthful sworn testimony "would place public employees who witness corruption in an impossible position, torn between the obligation to testify truthfully and the desire to avoid retaliation and keep their jobs").

can be understood as reigning in the scope of *Garcetti* as it has been applied in the lower courts. *See Mpoy*, 2014 WL 3407531, *7 ("[I]t is possible that *Winder*'s broad language, interpreting *Garcetti* as leaving an employee unprotected where he reports conduct that 'interferes with his job responsibilities,' could be in tension with *Lane*'s holding that an employee's speech is unprotected only when it is within the scope of the employee's 'ordinary job responsibilities.'") (quoting *Winder v. Erste*, 566 F.3d 209, 215 (D.C. Cir. 2009)).

Finally, the Court stressed on several occasions that "speech by public employees on subject matter related to their employment holds special value precisely because those employees gain knowledge on matters of public concern through their employment," and so "it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal." *Lane*, 134 S. Ct. at 2379–80; *see also id.* at 2377 (same).  Against this backdrop, this Court turns to consideration of whether Hagan spoke as a citizen in any of the five instances identified.

### i.       Email to Handy

When Hagan complained to Handy about a policy of improperly transferring EEO Officers who performed their jobs well, she spoke as a citizen and not as an employee.  After *Lane*, the focus is on her "ordinary" job responsibilities, and there is simply no indication from the allegations—nor any reason to think—that Hagan would *ordinarily* go outside of the chain-of-command, to a different agency, to report a systemic policy of improper conduct on the part of her supervisor and other officials.

Defendants argue that much of Hagan's speech is unprotected under the Second Circuit's pre-*Lane* decision in *Weintraub*.  Weintraub, a public school teacher, filed a grievance with his union after the school's assistant principal refused to discipline a student who had thrown books at him during class.  593 F.3d at 198–99.  The court held that "Weintraub's grievance was pursuant to his official duties because it was part-and-parcel of his concerns about his ability to

properly execute his duties, as a public school teacher—namely, to maintain classroom discipline, which an indispensable prerequisite to effective teaching and classroom learning." *Id.* at 203 (citations and quotations omitted). Put differently, his speech "was *in furtherance of* one of his *core* duties as a public school teacher" and "was a *means to fulfill* and *undertaken in the course of* performing his primary employment responsibility of teaching." *Id.* at 198, 203 (citations and quotations omitted) (emphases added). This conclusion was bolstered by the fact that "[t]he lodging of a union grievance is not a form or channel of discourse available to non-employee citizens," and "[r]ather than voicing his grievance through channels available to citizens generally, Weintraub made an internal communication pursuant to an existing dispute-resolution policy established by his employer, the Board of Education." *Id.* at 203–04 (citation omitted).

It is, of course, possible to understand Hagan's complaint to Handy as "in furtherance of" and "a means to fulfill" her primary employment responsibilities of investigating and remediating discrimination in the workplace. Yet *Weintraub*'s use of the terms "part-and-parcel," "core duties," and "indispensable prerequisite" suggests a focus upon speech that is a standard part of the employee's job activities, such that it is fair to say that the employer would reasonably expect the expression and is therefore entitled to exercise control over its form and content. *See, e.g.*, *Chrzanowski v. Bianchi*, 725 F.3d 734, 739 (7th Cir. 2013) ("daily professional activities"), *cert. denied*, 134 S. Ct. 2870 (2014). Even if Weintraub did not *frequently* file grievances with his union, the filing of such a grievance would be a standard and anticipated action taken in furtherance of his core duty of teaching.

Defendants' alternative reading of *Weintraub* would leave virtually any speech taken in furtherance of one's core duties unprotected, no matter how out-of-the-ordinary it might be. *See Weintraub*, 593 F.3d at 205–06 (Calabresi, J., dissenting) ("[T]he prerequisites for effective

41

learning are broad and contentious; everything from a healthy diet to a two-parent family has been suggested to be necessary for effective classroom and teaching, and hence speech on a wide variety of topics might all to readily be viewed as 'in furtherance of' the core duty of encouraging effective teaching and learning.").  Taking *Weintraub*'s limitation language at its face value avoids this result.  More importantly, it seems the only way to square *Weintraub* with *Lane*'s emphasis upon protecting some speech that is "related to" one's job and limiting *Garcetti*'s rule to "ordinary" job responsibilities.[17]  *See Dillon v. Suffolk Cnty. Dep't of Health Servs.*, 917 F. Supp. 2d 196, 210 (E.D.N.Y. 2013) ("Were 'part-and-parcel' to encompass all speech that aims to improve a government employee's workplace—thereby helping the employee carry out her core duties there—everything that employees say *relating to* their work would end up falling outside the First Amendment's protections.") (emphasis added).  Hagan therefore has plausibly alleged that her email to Handy is speech as a citizen under *Weintraub* and *Lane*.

### ii.      Report of Fraud and Corruption in ECTP to Post and Ahbaulm

Defendants contend that Hagan's report of fraud and corruption in the ECTP program is not protected because the staff person "had come to her office anonymously for an EEO matter" (Am. Compl. ¶ 252) and Hagan simply made an internal report to Post and Ahbaulm within the scope of her job functions.  They cite several cases for the proposition that speech based upon information learned during the performance of official duties is not protected.  *See, e.g.*, *Healy v. City of New York Dep't of Sanitation*, 286 Fed. App'x 744, 746 (2d Cir. 2008).  To the extent

---

[17] It is unclear at this point whether Hagan's complaint to Handy had a citizen analogue, but this fact is not dispositive.  *Weintraub*, 593 F.3d at 204 (quoting *Garcetti*, 547 U.S. at 420).

that these cases may be read for this proposition, they are no longer valid under *Lane*.  *See* 134 S.

Ct. at 2377.

Alternatively, Defendants argue that Hagan did not speak as a citizen because she had a

legal duty as an employee of the City, under Mayoral Executive Order 16, to report to her

supervisor "information concerning conduct which [she knows] or should reasonably [know] to

involve corrupt or other criminal activity."  *See* Exec. Order No. 16 (July 26, 1978), *available at*

http://www.nyc.gov/html/records/pdf/executive_orders_1978EO016.PDF.  They rely upon the

Second Circuit's decision in *Paola v. Spada*, which held that a state trooper's report of improper

conduct by another officer was not protected where the employee manual required employees "to

report information to a superior[] which may prove detrimental to the department" and a captain

attested that it was "understood" among officers "that a trooper is required to report wrongdoing

of a fellow officer to chain of command or Internal Affairs."  372 Fed. App'x 143, 147 (2d Cir.

2010) (citations and quotations omitted); *see also Barclay v. Michalsky*, 368 Fed. App'x 266 (2d

Cir. 2010) (speech unprotected where nurse reported abuse and other nurses sleeping on the job

because she testified that this was her "job" and a work rule required employees to report

violence against patients and employees not working).

Even under *Garcetti*, however, it was clear that an employer cannot use "excessively

broad job descriptions" to restrict employees' rights and that courts must therefore conduct a

"practical" inquiry since "[f]ormal job descriptions often bear little resemblance to the duties an

employee actually is *expected* to perform."  547 U.S. at 424–25; *see also Chrzanowski*, 725 F.3d

at 739 (understanding an assistant state attorney's official duty to cooperate in the pursuit of

justice to include testifying against his supervisor "follows only if one places dispositive weight

on an 'excessively broad job description[]' . . . [which] is precisely what the *Garcetti* Court

instructed us not to do when evaluating employee-speech claims").  Given *Lane*'s focus upon the

importance of public employees in exposing corruption in government, it seems even less likely that the City can broadly exempt reports of corrupt or criminal activity from the realm of constitutional protection for employees whose ordinary responsibilities do not include making such reports.

But it is not necessary to resolve this question now.  Both *Paola* and *Barclay* were resolved on summary judgment, after development of the record allowed the court to determine whether reporting misconduct and corruption was part of their "core" or "ordinary" job responsibilities.  Even if Hagan "may have been *required* by some broader written policy applicable to all [city employees]" to report corruption, discovery will reveal whether such reports by EEO Officers were "actually expected or permitted, much less tolerated, *in practice*." *Griffin v. City of New York*, 880 F. Supp. 2d 384, 397 (E.D.N.Y. 2012).  Defendants are not entitled to dismissal of this portion of Hagan's claim at this early stage.

### iii.   Opposition to the Task Force's Recommendations

Hagan's opposition to the Task Force recommendations is not protected speech.  As Defendants point out, Hagan describes her job duties as "monitor[ing] the agency's hiring process" and "advis[ing] staff on the city's EEO policy," and represents that the Task Force meeting was attended by other "EEO professionals."  (Am. Compl. ¶¶ 36, 244.)  The meeting agenda, which she attaches to her opposition affidavit as an exhibit, is similarly titled "Citywide EEO Working Group Meeting" and includes as an agenda item "[n]otes on developing an agency diversity program."  (Dkt. No. 45, Ex. 44.)  Hagan's expression of her opinions during the Task Force meeting was thus precisely what her employer expected her to do, and it therefore falls within the logic of *Garcetti* as "work product" owing its existence to her duties and subject to control by DOITT.  Had she given her opinion in an inflammatory and disruptive manner, the City would be free to exclude her from future task force meetings (as she alleges it did) to ensure

their orderly operation.  This conclusion finds support in the fact that the meeting was limited to EEO Officers, and ordinary citizens could not attend or give their opinions.[18]

### iv.     Conveyance of DOC Captain's Complaint to DOI and City Council

Hagan was approached by the DOC Captain with reports of discrimination, retaliation, and corruption by a political official.  As previously noted, reporting discrimination and retaliation to her employer was part of Hagan's ordinary job responsibilities and is therefore not protected.  Moreover, even assuming that reporting corruption, on its own, was not part of her ordinary responsibilities, Hagan's report of corruption in this instance was literally "part-and-parcel" of her report of discrimination and retaliation and therefore falls within the scope of her speech as an employee.

The analysis is complicated, however, by the fact that Hagan went not only to DOI—another agency—but also to several members of the City Council.  While it may be the case, as Defendants suggest, that reaching out to DOI was a standard and expected practice for employees who came across evidence of political corruption, it seems far less plausible that going directly to the City Council would be an ordinary job responsibility.  *See, e.g.*, *Sassi v. Lou-Gould*, 05–CV–10450 (CLB), 2007 WL 635579, *3 (S.D.N.Y. Feb. 27, 2007).  Moreover, as the Second Circuit recognized in *Weintraub*, "an indicium that speech by a public employee has a civilian analogue is that the employee's speech was to 'an independent agency' responsible for entertaining complaints by 'any citizen in a democratic society regardless of his status as a public employee.'"  *Jackler*, 658 F.3d at 241 (quoting *Weintraub*, 593 F.3d at 204).  Since Hagan

---

[18] Defendants raise a similar counterargument to Hagan's allegation that during the Task Force meeting she "expressed concerns about the role that Crothers and newly appointed Chief Diversity Officer, Wayne Rustin wanted EEO Officers to play."  (Dkt. No. 43 ¶ 88.)  Because this is an entirely new allegation in her opposition affidavit that does not come within the ambit of the complaint, the Court does not consider it.

did what any other citizen could when she communicated with the City Council, her speech has a civilian analogue, which casts further doubt upon the inference that she was speaking as an employee when she conveyed the complaint.  At this stage, it is too early to tell whether Hagan was ordinarily expected to make such a report, and she has plausibly alleged that she was not.

v.      <b>Opposition to DOITT's Environment of Cronyism</b>

Hagan's persistent and widespread opposition to DOITT's environment of cronyism and to the practice of disregarding diversity policies is analogous to her email to Handy.  It seems implausible that her ordinary job responsibilities would include actively undermining her supervisor's efforts and asserting rights *against* DOITT, as opposed to aiding the agency in complying with the law and EEO policy.  Hagan has therefore adequately alleged that she spoke as a citizen in these circumstances.

### D.      Claims Against the Individual Defendants Under § 1981, § 1983, the SHRL, and the CHRL

Unlike Title VII, §§ 1981 and 1983 hold individuals liable for discriminatory and retaliatory conduct if there is "some affirmative link to causally connect the actor with the discrimination action," such that the claim is "predicated on the actor's personal involvement." *Whidbee*, 223 F.3d at 75 (citations and quotations omitted).  Personal involvement includes not only direct participation but also "an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates."  *Hayut*, 352 F.3d at 753 (citation omitted).  The SHRL and CHRL similarly provide for individual liability for persons who "aid, abet, incite, compel, or

coerce the doing of any of the acts forbidden [thereunder], or attempt to do so."[19]  N.Y. Exec. L. § 296(6); N.Y.C. Admin. Code § 8–107(6).  This provision reaches conduct by a supervisor or "a co-worker who 'actually participates in the conduct giving rise to a discrimination claim.'" *Feingold*, 366 F.3d at 158 (quoting *Tomka*, 66 F.3d at 1317); *see also id.* at 158 (noting that the same aiding and abetting standards apply to the SHRL and CHRL).  If individual liability is shown under §§ 1981 and 1983, it is also established under the SHRL and CHRL.  *See Feingold*, 366 F.3d at 159 (citations omitted).

### 1.     Post

The majority of Hagan's allegations are made against Post, who, as her supervisor, is claimed to have subjected her to disparate terms and conditions; promoted an environment of cronyism and undermined the EEO Officer position and diversity policies; made racially insensitive remarks; and orchestrated her demise in retaliation for her protected activities.  Indeed, in many instances Post provides the conduit by which liability might be imposed upon the City.  Hagan has therefore adequately alleged her personal involvement as to each claim.

### 2.     Crothers

Hagan's allegations against Crothers are less extensive, but substantively no different.  Crothers purportedly subjected Hagan and other minority EEO Officers to lesser titles and compensation than Caucasians; harassed Hagan for information on managerial hires despite asking Johnson only once; directed employees to implement the Task Force recommendations despite knowing that they would facilitate cronyism and undermine diversity policies; and participated with Post in retaliating against Hagan and other EEO Officers, notably by

---

[19] The CHRL also provides direct liability for "an employer or an employee or agent thereof" who engages in discrimination.  N.Y.C. Admin. Code § 8–107(a).

coordinating their involuntary transfers.  This is adequate to allege personal involvement with respect to each of her claims.

### 3.    Handy

Hagan makes only three allegations against Handy: first, that she failed to do anything about DOITT's policy of involuntarily transferring EEO Officers after Hagan brought it to her attention; second, that she told LeGoff about Hagan's May 12 email, which led LeGoff to engage in retaliation; and third, that she again refused to address the involuntary transfer of EEO Officers when Hagan followed up on August 15, 2011.  While these allegations make it plausible that Handy was personally involved in retaliation, they do not provide any basis for finding that she was involved in discrimination.  Hagan does not allege that Handy knew her race, and there is also no basis to infer that Handy knew about DOITT's alleged policy of cronyism. Accordingly, Hagan's claims against Handy for discrimination are dismissed.

### 4.    Oliver

Hagan alleges that Oliver promoted the City's policy of cronyism (at MOME) and only hired Caucasians; refused to address complaints of discrimination and interfered with Hagan's investigations; exhibited racial animus against an Asian employee; and retaliated against Hagan for investigating the MOME complaint by prohibiting her from visiting any MOME sites, which interfered with her ability to do her job.  These allegations are insufficient to allege her personal involvement with respect to any of Hagan's discrimination or retaliation claims.

As to the former, preventing Hagan from visiting MOME does not constitute a materially adverse change in employment conditions.  Even assuming it did, Hagan concedes that "the City's EEO Policy prohibits EEO Officers from investigating Commissioners" (Am. Compl. ¶ 203), and that Oliver was angry that she had reached out to staff members without her

48

permission.  These circumstances do not plausibly give rise to an inference of discriminatory intent on the part of Oliver.

As to the latter, Hagan again has not pleaded an adverse employment action, and the same reasons precluding an inference of discriminatory intent make any causal connection too tenuous to be plausible.  It is much more likely that Oliver did not want Hagan near MOME because she had violated EEO Policy and gone behind her back in conducting an investigation in which Oliver was a respondent.  Hagan's retaliation fails for the additional reason that her investigation into Oliver was not protected activity under anti-discrimination law or the First Amendment.  Participation in an internal investigation, unrelated to a formal charge with the EEOC, is not protected activity under Title VII or its state and city counterparts.  *Townsend*, 679 F.3d at 48.  Nor was Hagan speaking as a citizen, since it was her ordinary job responsibility to investigate complaints of discrimination.  Hagan's claims against Oliver are therefore dismissed.

### 5.    LeGoff

Hagan's allegations against LeGoff include that she exhibited racial animus toward her predominantly African-American staff and regularly interacted only with the sole Latina; altered the findings of EEO investigations to suit agency politics and interfered with Hagan's investigation; and retaliated against Hagan for contacting Handy by attempting to stop her from training, writing her up for losing her identification card after she had located it, attempting to entrap her into soliciting a client on DOC premises, and—also in retaliation for reporting the DOC Captain's charges—created a work environment that was "filled with hostility" and fired her the day before her employment was supposed to end.  Hagan also plausibly alleges that LeGoff acquiesced in Post's and Crothers's plan to involuntarily transfer her to DOC to a position that had never before existed and amounted to a demotion.

These allegations are sufficient to plausibly suggest that LeGoff discriminated and retaliated against Hagan.  Specifically, the fact that LeGoff plausibly harbored discriminatory intent toward her African-American staff makes it more likely that she similarly would discriminate against Hagan, including by participating in her involuntary transfer and accelerating her termination.  Moreover, the temporal proximity between Hagan's complaint to Handy and her (implicit) allegation that LeGoff knew of the complaint render it plausible that LeGoff was personally involved in retaliation.

## IV.   Conclusion

For the foregoing reasons, it is hereby ORDERED that Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Hagan's §§ 1981 and 1983 disparate impact claims are dismissed, as are her Title VII hostile work environment claims against the individual defendants, her discrimination claims against Handy, and all claims against Oliver.  The remainder of her claims survive.

The Clerk of Court is directed to terminate the motion at docket number 21.

SO ORDERED.

Dated:  August 15, 2014
      New York, New York

                                _____
                                     J. PAUL OETKEN
                               United States District Judge